**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

FILED

2011 FEB -2 PM 1:04

US DISTRICT COURT
MIDDLE DISTRICT OF FL
ORLANDO FLORIDA

ABDIEL ECHEVERRIA &  §
  §
ISABEL SANTAMARIA  §
  §
  §
Plaintiffs,  §
  §
  §
v.  §   Case No. 6:10-CV-1933-ORL-31-GJK
  §
  §
BAC HOME LOANS SERVICING, LP, and  §
  §
BANK OF AMERICA, N.A.  §
  §
  §
Defendants,  §

-28-

**FIRST AMENDED COMPLAINT**

**I. PRELIMINARY STATEMENT**

1. Plaintiffs are representing themselves (Pro Se) and purchased their first home on February

29, 2008 with loan assistance from the Federal Housing Administration (FHA). Their loans were

initially serviced by Taylor, Bean & Whitaker until early August 2009 and was then serviced by

Defendant BAC, which is a wholly owned subsidiary of Defendant Bank of America, N.A. This

lawsuit complains not of poor customer service by BAC, but of a systematic home loan servicing

scheme that includes loan servicing fraud, premature threats, hours of telephone runaround,

misleading and inconsistent information, lost correspondence, negligence, verbal abuse, and

extensive delay, all of which have documented costs not only in terms of money, but in health.

The facts in this case reveal the harsh reality that underlies the loan servicer's press statements

about loan modifications following the collapse of the U.S. housing market.

## II. JURISDICTION

2.  The court has federal question jurisdiction under 28 U.S.C. §1331 over the claims

arising under 12 U.S.C. § 2605.

3.  The court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiffs'

claims of Breach of Contract. The court has federal question jurisdiction under 28 U.S.C. §1331

over the claims arising contract, negligent misrepresentation, unreasonable collection efforts,

violation of 18 U.S.C. § 1961-1968 Civil RICO; "Organized Crime Control Act"; "Rackateer

Influenced Corrupt Organizations Act" and violations of the "Federal Debt Collection Act"

because Plaintiffs' claims are so related to the claims within the court's original jurisdiction that

they form part of the same case or controversy under Article 3 of the U.S. Constitution.

4.  The court has diversity jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1)

because the Plaintiffs and Defendants are citizens of different states and the amount in

controversy exceeds $75,000, excluding interest and costs. The property in question is located in

Brevard County, Florida.

## III. PARTIES

5. Abdiel Echeverria (Brevard County, Florida) and Isabel Santamaria (Brevard County, Florida), Plaintiffs.

6. Defendant Bank of America, N.A. is a banking association that has its main office located in North Carolina. Defendant Bank of America, N.A. may be served with process by serving its registered agent, CT Corporation, 1200 S. Pine Island Rd. Suite 250, Plantation, Florida 33324.

7. Defendant BAC Home Loans Servicing, LP is a limited partnership. BAC has only two partners: BANA LP, LLC and BAC GP, LLC. Both partners are wholly owned by Bank of America, N.A, which is a citizen of North Carolina. Therefore, Defendant BAC Home Loans Servicing, LP is a citizen of North Carolina, and may be served with process by serving its registered agent, CT Corporation, at 1200 S. Pine Island Rd. Suite 250, Plantation, Florida 33324.

## IV. BACKGROUND

8. Defendant BAC is a wholly owned subsidiary of the well-known banking Institution, Bank of America. Defendant BAC performs "servicing" of home loans for various parties that own the right to receive payments on the loan (holders). These holders are often investors, securitized trusts, or banking institutions that do not have the infrastructure to collect payments from borrowers or, in their business judgment, have found it preferable to use a "servicer," such as Defendant BAC. The exact type of "servicing" that a "servicer" performs is often controlled by private contract or government regulation, depending on the type of loan.

However, servicing generally includes such functions as collecting payments, communicating with borrowers on the holder's behalf, and in some cases, administering a foreclosure.

9.  In some instances, federal and state governments also impose requirements on loan servicers. Although this lawsuit does not allege a private right of action arises under any of these regulations or programs, in some cases these requirements have been incorporated contractually in to Plaintiffs' loan documents, and in addition, these requirements provide helpful background in understanding the functions that Defendant BAC has agreed to perform on behalf of loan holders, and demonstrate a clear federal policy in favor of preserving home ownership when feasible where loans of the type that Plaintiffs have obtained are involved.

10.  Plaintiffs have a home loan that is insured by the Federal Housing Administration ("FHA"). The Plaintiffs pay a monthly premium to the FHA to insure their mortgages against the risk of default, which provides an incentive to lenders to offer loans to borrowers that otherwise might not be qualified for the loan. The U.S. Department of Housing and Urban Development ("HUD") releases "mortgagee letters" describing the obligations of those servicing FHA insured loans. Mortgagee Letter 2000-05 describes a program called "Loss Mitigation" that gives lenders and servicers both "the authority and the responsibility to utilize actions and strategies to assist borrowers in default in retaining their homes, and/or in reducing losses to FHA's insurance funds." The Mortgagee Letter further provides in bold capitalized letters, **"PARTICIPATION IN THE LOSS MITIGATION PROGRAM IS NOT OPTIONAL."**

11. In addition, Defendants have *agreed* to participate in the "Home Affordable Modification Program" ("HAMP"), which is a federal program introduced by the U.S.

Department of the Treasury to assist at-risk homeowners restructure their mortgages to avoid foreclosure. *See* Home Affordable Modification Program, Supplemental Directive 09-01, Apr. 6, 2009, *available at https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0901.pdf.* Under the terms of the program, the Treasury Department provides financial incentives for banks to reduce homeowners' monthly mortgage payments to sustainable levels. *See* Home Affordable Modification Program Guidelines, March 4, 2009, *available at:* http://www.treas.gov/press/releases/reports/modification_program_guidelines.pdf, (hereinafter HAMP Guidelines). Defendant BAC states in their website: www.bankofamerica.com under "Home Loan Assistance" the following: *"Let's work together to keep you in your home. Help is available for homeowners experiencing payment difficulties, and we're committed to connecting you with a solution, if we can, that can help you stay in your home. No matter what your situation is, we're here to help".*

12. In order to participate in HAMP, loan servicers must execute a servicer participation agreement with Fannie Mae as agent for the Treasury Department. HAMP Supplemental Directive 09-01 at 1. Although, decisions about whether to modify the original terms of a mortgage (such as by reducing the interest rate or extending the term of the loan) are generally governed by the private contract between a lender and a borrower, the HAMP guidelines place heightened requirements on participating servicers to modify the original terms of mortgage loans in certain circumstances described by the program.

## V. FACTS

13. The Plaintiffs were told by Bank of America (BAC) representative Tolana, that they were

eligible for a loan modification on January 12, 2010, only to spend months being shuffled through Defendant BAC's "Home Retention," "HOPE", and "Collections" departments with no resolution. Instead of providing Plaintiffs with basic information about the servicing of their loans and providing timely screenings for workout assistance, however, Defendant BAC misrepresented material information to the Plaintiffs about their loans, and forced them into a scheme of operation so horribly dysfunctional that the constant barrage of misinformation, misdirection, and deliberate inactivity amounted to abuse and harassment.

14. Plaintiffs describe feeling "harassed," "mislead", "mistreated", "ignored", "abused" and "scammed" all with malicious intent. When Plaintiffs called Defendant BAC, the information they received over the telephone often conflicted with written statements or prior telephone conversations. In many of the telephone calls, Defendant BAC spun Plaintiffs in a labyrinth of transfers from one department to another and back again. Plaintiff (Isabel Santamaria) spent countless hours on the telephone, explaining their story to a different person each time they called; often she was transferred between departments, knowing she would never speak to the same person again, and knowing that the information being provided would be contradicted by the next person they spoke with. It became a vicious web of lies.

15. Requests to speak with supervisors or managers were met with resistance. During the course of telephone calls to Defendant BAC, Plaintiff often found herself being disconnected after waiting on hold to speak to a supervisor, or was told that no supervisors were available.

16. Written communications did not fare better. Plaintiffs' written submissions were often lost or misplaced. Plaintiffs were asked to sign the same documents three, four or even five

times, and were asked to provide the same information over and over again. These requests were submitted to the Plaintiff at times via Fed Ex envelopes by the Defendant BAC.

17. Plaintiffs' experiences are not isolated incidents, but instead reveal a pattern and practice by Defendant BAC of deception and deliberately misinforming borrowers in default or at risk of default, and refusing to respond to Plaintiffs' legitimate, written and oral requests for information. Plaintiff's requests remained ignored or were responded with generic responses asking that Plaintiff call customer service, the same department that would cause the Plaintiff to endure such emotional distress that she began to have mental and physical health issues. Plaintiff requested that due to Bank of America's negligence, she would prefer to be contacted via mail or email or through her Attorney Philip Healey and later Attorney Angela Sigman who assisted them from April 2010 until September 2010. Plaintiff's Attorney suggested that litigation be initiated against Bank of America because they refused to comply with the Demand Letter. Plaintiffs had to proceed "Pro Se" because no attorney wanted to take their case on a contingency basis and legal representation became impossible once they knew the Defendants would be BAC (Bank of America). The costs incurred would be very high and Plaintiffs were not able to cover these costs. Even so, the attorneys did confirm that Plaintiffs had a very good case.

### Abdiel Echeverria & Isabel Santamaria

18. On February 29, 2008, Plaintiff, Abdiel Echeverria along with his spouse, Plaintiff Isabel Santamaria took out a federally-insured home loan in the amount of $144,079.00 from Taylor, Bean & Whitaker which included cash from Borrowers (Plaintiffs) of $23,998.24 for the total purchase price of $167,000.00 for home located on 499 Cellini Ave NE, Palm Bay, Florida

32907. A true copy of the Mortgage ("Security Instrument") is attached as Exhibit A. The General Warranty Deed is attached as Exhibit B. The servicing of this loan was later transferred to Defendant BAC when Taylor, Bean & Whitaker was closed by the Federal Bureau of Investigations in August 2009. In addition, Plaintiffs had invested over $30,000.00 in home improvements because the home was dated and also needed necessary repairs. The Plaintiff's economic situation was stable at the time.

19. Plaintiff's (Isabel Santamaria) hours for work were reduced in late 2008 and continued to decline throughout the year. During this time the Plaintiffs had to voluntary relinquish their automobile (Chevy Uplander Van) in order to try to make ends meet and continue to pay their mortgage. They continued to pay their mortgage and continued to have perfect credit with Taylor, Bean & Whitaker. During this time however, Plaintiff's became increasingly concerned about their son Jonathan who had been showing odd behavior for some time. Plaintiffs continued to take their son to the Doctor and expressed their concerns and were told to wait until he started school so his teacher can make further observations. Jonathan was 4 years old at the time.

20. On approximately May or June of 2009, Plaintiff (Isabel Santamaria) requested a loan modification from her then current servicer at the time, Taylor, Bean & Whitaker ("TB&W"). She was told she would receive a "packet" which never arrived. Plaintiff called again 2 months later and was told the same thing. During this time, problems were obviously unfolding with TB&W that Plaintiff was not aware of. Plaintiff's income continued to decrease.

21. In mid-late September 2009, Plaintiffs found out by telephone that their loan was sold to Defendant BAC via their bi-weekly mortgage program Equity Plus (1-800-361-1205). Plaintiff

did not receive notice that loan was sold or transferred during the required time frame in

Violation of 12 U.S.C. § 2605 (c) and therefore Equity Plus submitted the September payment

wrongfully to Taylor, Bean & Whitaker (TB&W). Plaintiff was advised by Equity Plus to call

her new servicer (BAC) to obtain their new loan number and provide it to Equity Plus. Once

known who the new servicer was, Plaintiff tried to request help this month via a loan

modification but was told that at this time they did not qualify. Defendant later continued to state

for many months to the Plaintiff and consequentially to their Attorney at the time, Angela

Sigman, that the September 2009 payment was never received from TB&W but it was indeed

paid to Defendant BAC by TB&W with check no. 384858.

22.  Plaintiff noticed on their first statement received from BAC dated August 28, 2009 but

received in the latter part of September 2009, that there was a past due amount of $1,284.58

(please see statement attached as Exhibit C ). Plaintiff (Isabel Santamaria) proceeded to call and

complain about this amount due. Bank of America stated that they had not received the August

2009 payment that the Plaintiffs sent to TB&W in early August 2009. This August payment was

paid from an overage submitted the previous month (July 2009) of $642.29 along with a money

order for the other half ($642.29). Plaintiff's (Isabel) mother helped her with some of the money

and purchased the money order. The total payment submitted in July 2009 by Equity Plus was

$1,926.87. This is a payment and a half of the original payment of $1,284.58 ($1,284.58 +

$642.29 = $1,926.87). See Taylor, Bean & Whitaker Payment History as Exhibit D. When

Plaintiff called to explain this to Bank of America, she was confused about everything that was

going on and BAC told her that there was nothing they could do. Plaintiffs did not want to

submit a payment again that they could not afford and that was already paid. Plaintiff continued

to investigate this issue and there is indeed several thousands of Taylor, Bean & Whitaker

customers in which their August 2009 was never posted. This bankruptcy case (Case No. 3:09-bk-07047-JAF) is currently pending and will resolve borrowers issues. Even with this knowledge, Bank of America refused to honor this request from the customer and continued to charge this past due amount.

23.  Plaintiff's son Jonathan began attending school and his kindergarten teacher stated that Jonathan had major issues and had to see a psychologist. After several tests performed by Dr. Kathy Pierce, Jonathan was diagnosed with Autism and ADHD and needs to be under observation for Schizophrenia. Plaintiffs were obviously devastated and this diagnosis added more financial burden because it is extremely expensive to care for an Autistic child. Jonathan has destructive behavior which includes destroying furniture, his clothing and other items. Furthermore, medical care is an added expense in which the Plaintiffs could not afford. Plaintiffs have a high deductible and also have to pay co-pays or a percentage of the medical costs. Plaintiff's child does not receive any monetary government assistance. Plaintiffs are solely responsible for his expenses.

24.  On October 15, 2009, Plaintiff called BAC once again to request assistance. Bank of America representative stated that they did not qualify because expenses were not high enough and that Plaintiffs were not behind on their mortgage. Plaintiff (Isabel) obviously thought that past due was corrected by this statement. Plaintiff advised that sadly she was not going to be able to pay November 2009 because of their financial situation. BAC rep stated that she can call back and receive assistance once they fully met the criteria.

25. Plaintiff received a statement (Escrow Account Overview) dated 10/09/2009 stating that they had an escrow shortage of $1,039.95 (see Escrow Account Overview copy as Exhibit E ). This statement was received by the Plaintiff late. Plaintiffs knew this could not be true since they were paying a higher escrow from the previous year. Plaintiff called BAC as soon as she received the property tax bill so that they can adjust her payment due to an obvious reduction in escrow. Bank of America male representative in Escrow Department entered information in the system and provided Plaintiff with her new payment as of November 1, 2009 for the amount of $1,215.13. Plaintiffs continued to make their payments for this amount every month. Defendants (BAC) continued to send the Plaintiffs conflicting and erroneous amounts on their statements. Plaintiffs were paying on escrow $397.46 monthly until October 2009 which was based on previous tax bill which was much higher. Taxes paid on November 2009 were $1,915.37, drastically reduced by $847.22 from the year before (see Brevard Real Estate Taxes for 2009 as Exhibit F ). In addition, Homeowners Insurance was reduced by $50.00. It was now $1,251.00 not $1,301.00 as the previous year (see St Johns Insurance Company Renewal date due 02/28/2010 as Exhibit G ). Nevertheless, Bank of America advised the Plaintiff that there was a substantial escrow shortage on their account.

26. Plaintiffs receive in the mail a monthly statement from Defendant BAC dated 08/29/2009 with a past due amount of $1,284.00 (see payment statement dated 08/29/2009 as Exhibit H). Plaintiffs received monthly statement in the mail dated October 29, 2009 stating a past due amount (see 10/29/2009 statement copy as Exhibit I ). Approximately two (2) weeks later, Plaintiffs receive another payment statement dated 11/10/2009 (see payment statement copy dated 11/10/2009 as Exhibit J ) once again stating a past due amount of $1,284.58 which was the Plaintiff mortgage payment at the time. However, payment statement dated 10/09/2009

(see statement dated 10/09/2009 as Exhibit K ) does not have a past due amount which contradicts the previous statement and the other statements that followed. These statements were all dated before the Plaintiffs initially missed their first payment in November 2009 in which they had already advised the Defendant and this payment was due no later than November 16, 2009. After November 16, 2009 is when payment would then be officially considered late. Plaintiff also noticed that August, September and October escrow payments were not posted at all even though payments were sent as per Escrow Account Review statements dated 10/09/2009 (see Escrow Account Review Statement as Exhibit E ), 11/10/2009 (see Escrow Account Review attached as Exhibit L), 12/22/2010 (see Escrow Account Review attached as Exhibit M) and 01/15/2010 (see Escrow Account Review attached as Exhibit N). Defendants received payments from the Plaintiffs for those months but discrepancies continued. These Escrow Account Reviews were mailed with their corresponding monthly payment statements. These Escrow Account Reviews also show that Homeowners Insurance payment was $1,301.00 and was paid on August 2009 and is due again for the same amount on August 2010. In reality, Plaintiff's Homeowners Insurance to St. Johns is due the day of closing which was February 29th and therefore is due every February 28th.

27.  As per December 22, 2009 statement, past due amount is now $3,853.74 (please see again as Exhibit C). This would have meant that Plaintiff had already missed three (3) payments and then some. It also states that there is a partial payment of $1,215.76 which would actually be the new payment amount. Plaintiff called to complain and was met with resistance and account was not corrected. Plaintiff was bounced around and no one would help her.

28.  On January 10, 2010, Plaintiffs received a "Notice of Intent to Accelerate" dated January

6, 2010 (see Notice of Intent to Accelerate 1/6/10 copy as Exhibit O ). The monthly charges on this Notice were $3,853.74, late charges of $102.76, other charges of $51.38, uncollected costs of $100.00 and a partial payment balance of ($1,146.94). Total due stated was $2,960.94. This is the first documented premature "threat" that Bank of America sent to the Plaintiffs.

29.  Plaintiff called BAC on January 12, 2010 to request a loan modification and also question about the Notice just received. Plaintiff spoke to Tolana who assisted her with the pre-qualification process and Plaintiff was approved for pre-qualification. The representative told the Plaintiff that she will receive a packet in the mail with a list of all the documents required and some paperwork for them to sign. Representative also instructed to the Plaintiff that she put her account number on every single page and she did as instructed. The representative told Plaintiff over the phone what were the documents required and that she can go ahead and fax them ahead of time to (866)261-6472. Plaintiff tried several times with no success for 4 consecutive days and then was provided another number (800)658-0355 and tried to fax it on January 15th with no success. Plaintiff then made copies and proceeded to mail the documents requested to the HOPE Department at: HOPE Dept. PTX-A65;  7105 Corporate Dr.  Plano, TX 75024 on January 16, 2010.

30.  On January 15, 2010, Plaintiff called Bank of America in regards to her escrow discrepancies. Plaintiff spoke to Sherie in Customer Service and spoke to several other representatives that told her she had a deficit and that no overage is due back to them. Finally, Plaintiff spoke to Jessica in the Escrow Department and Jessica confirmed that they indeed had an overage of $824.00 and not a deficit as they had been previously advised. That amount was close to what the Plaintiffs had in mind all along. Plaintiff called back a few days later to check

to see if financial documents were received and was told that they were not. Plaintiff assumed

that it was possibly sent to the wrong department and therefore waited patiently for the packet so

that she could resubmit once again. Plaintiff spoke to Debbie Daniels in the HOPE Department

and was given another number to contact Hope Department which was (877) 643-2788 option 3.

Packet was finally received on January 29, 2010 via Fed Ex envelope dated January 27, 2010

(see attached copy of envelope as Exhibit P) and stated that all documents must be received by

February 5, 2010. Plaintiff found that this was too little time but she gathered up all documents

requested on the Documentation Checklist (see copy as Exhibit Q ). Plaintiff went to Office

Depot on February 2, 2010 and made 61 copies of documents (see receipt attached as Exhibit R )

and submitted everything to Defendant BAC ("Bank of America") in the enclosed pre-paid Fed

Ex envelope that same day.

31. Plaintiff received a letter dated February 23rd from Home Retention Division stating that

Plaintiff did not submit all documents as requested. On this letter (see Exhibit S ), it states that

Borrower "did not return all applicable financial documentation requested". Plaintiff called to

complain and was told that two most recent paystubs were missing. Plaintiff (Isabel Santamaria)

has performed many work related tasks that involve secretarial work which included submitting

documents and therefore Plaintiff is very well aware of how to send all requested documents.

Plaintiff checked the documents several times before sending and sent the most recent paystubs.

32. Again, for the next few months Plaintiff continued to receive statements with incorrect

and conflicting past due and escrow balances. For October 9, 2009 statement (see previously

attached as Exhibit K), escrow balance is of $3,049.37. However, for this same month, Plaintiff

received notice of an escrow shortage of $1,039.95 (see previously attached as Exhibit E). Also,

October 9, 2009 statement does not have a past due amount.

33. For statement dated October 29, 2009 (see as previously attached as Exhibit I ), there is now a past due balance of $1,284.58. The escrow amount remains the same even though BAC received a payment of $1,284.58 from Plaintiff via Equity Plus (see attached Equity Plus Account History as Exhibit T). Payment also increased to $1,335.96. Payment submitted on October 9, 2009 by Plaintiff is not shown as a payment received in October on this statement.

34. For statement dated 11/10/09, (see previously attached statement copy as Exhibit J ) payment decreases in comparison to the previous statement to $1,267.13. Past due amount is $1,284.58. Escrow balance is $2,996.93.

35. For statement dated 12/22/2009 (see statement copy attached as Exhibit U ), past due is dramatically increased to $3,853.74. Escrow is reduced to $1,023.44 in part because property taxes were paid the month before. Bank of America received a payment from Plaintiff this month on December 4, 2009 in the amount of $1,215.76 which is the new payment amount as of November 1, 2009. Payment increases to $1,438.72. There is a partial payment balance of $1.215.76. Plaintiff continued to argue and dispute these amounts by calling Bank of America regarding these constant discrepancies.

36. For statement dated 01/15/2010 (see attached statement as Exhibit V), escrow balance increases and past due amount is now $2,426.54. Defendant (BAC) received payment of $1,215.76 from Plaintiff on January 4, 2010. There is now a partial payment balance of $1,146.94.

37. For monthly statement dated 02/25/2010 (see attached statement as Exhibit W), payment is now $1,410.24, escrow balance is now $1,304.66 (previous month it was $1,362.78) which reflects the MIP payment of $58.12. There is no payment posted for this month even though a payment of $1,215.76 was indeed received from the Plaintiff on February 3, 2010. No escrow payment was posted for this month (February 2010) even though payment was received from Plaintiff.

38. For monthly statement dated 03/30/2010 (see attached statement as Exhibit X), there is now a past due amount of $6,066.35. This would mean that the Plaintiffs were behind five (5) months at the time. Again, Plaintiffs only missed their November 2009 payment and BAC was forewarned about this. Plaintiff continued to make payments every month. Payment due on this statement is $1,401.24. Partial payment balance is $1,146.94. Escrow balance is now -$4.46 after Homeowners Insurance payment made but this deficit is incorrect. No escrow payment was posted again for this month (March 2010). During this whole process, Plaintiff continued to call BAC to argue these discrepancies. She was met with resistance and was told that she was four (4) months behind several times. Plaintiff continued to get increasingly agitated for every call. She felt that she was a victim of a "crime" but hoped that these issues would be corrected. Their once perfect "mortgage" credit is now severely damaged by BAC.

39. For monthly statement dated 04/29/2010 (see attached statement as Exhibit Y), payment amount is now $1,548.36. Past due payment is now $3,639.81 and the partial payment balance is $1,146.94. It states that payments were received on 04/20/2010 in the amount of $3,647.28. In reality, payment was made by Plaintiff to Defendant BAC for April on 04/02/2010 in the amount

of $1,215.76. Escrow balance is now magically increased to $916.63. During this time, BAC
continued to say that Plaintiffs were four (4) months behind.

40. For monthly statement dated 05/28/2010 (see attached statement as Exhibit Z ), the
payment amount due on June 1, 2010 is $1,596.89. The past due amount continues to be
$3,639.81. Partial payment continues to be $1,149.43. Escrow balance is now $1,185.42.
Payment received is $1,215.76. This was the last payment that Equity Plus would submit on
Plaintiffs' behalf. Equity Plus dropped the Plaintiffs from the program because of all of the
issues they were having with Defendant Bank of America (BAC). This became a great
inconvenience to the Plaintiffs because money was withdrawn bi-weekly ahead of time from
their bank account in order to make their monthly payments and it made it a little more
manageable for them. The program also had the benefit of paying off the mortgage much sooner
which was always the intention of the Plaintiffs until their economic situation changed and then
suffered the major inconvenience of having BAC forced upon them as their new loan servicer.

41. For monthly statement dated 06/29/2010 (see attached statement as Exhibit AA ), the
payment amount due on July 1, 2010 is $1,613.27. The past due payment continues to be
$3,639.81. The escrow balance is now $1,454.21. Partial payment balance is now $1,181.16. The
payment received is $1,245.00. Plaintiffs submitted this payment on 06/18/2010 (confirmation
no. 618000112) through their online banking with Riverside N.B. (see payment confirmation as
Exhibit AB). BAC posted payment on 06/24/2010. Plaintiffs had previously advised BAC with
letter dated June 15, 2010 that they were submitting payment a little late this month because they
did not have enough money yet (see letter from Plaintiff dated June 15, 2010 attached as Exhibit

AC ). This letter was faxed to (972) 608-6460 BAC at Plano, Texas location (see Fax
confirmation for 06/15/10 as Exhibit AD ).

42. For monthly statement 07/29/2010 (see attached statement as Exhibit AE ), payment due
continues to be $1,613.27 as the previous month. Past due amount continues to be $3,639.81.
Escrow balance is now $1,723.00. No payment is acknowledged on this statement. Payment was
submitted by Plaintiff on 07/27/2010 (confirmation no.727000124) which was once again late
due to lack of funds to pay but nevertheless, a payment was submitted in July 2010 (see attached
payment confirmation as Exhibit AF ). Plaintiff had advised the Defendants ahead of time in a
letter faxed to the Defendants (BAC) on 07/19/2010 (see Plaintiff letter dated 07/16/2009 as
Exhibit AG ) to fax number (866)261-6472 (see attached fax confirmation report as Exhibit
AH ). Partial payment balance is $1,183.65. During all this time BAC continued to say that
Plaintiff was at least four (4) months behind.

43. For monthly statement dated 08/30/2010 (see attached statement as Exhibit AI ),
payment due on September 1, 2010 continues to be $1,613.27. Past due amount is $4,853.08.
Partial payment balance is $1,183.65. Escrow balance is $1,665.64. Payment for August 2010
was sent late again due to lack of funds and was submitted at a later date. It is expected on this
statement that no payment be shown as posted yet for August 2010 because payment was
submitted late on September 7, 2010 (confirmation no. 90700013). See Payment Confirmation
on bank statement dated September 7, 2010 as Exhibit AJ .

44. For monthly statement date 09/29/2010 (see attached statement as Exhibit AK ), payment
due on October 1, 2010 is now $1,407.39. Escrow balance is $1,934.43. No payments were
posted this month. After many requests for assistance, Plaintiffs had to start defaulting more

because assistance was not received and their requests were ignored. Plaintiffs tried everything possible by continuing to send payments every month that they could no longer afford in order to keep their home.

45. For monthly statement dated 10/28/2010 (see statement attached as Exhibit AL ), payment due November 1, 2010 is $1,407.39. Partial payment balance is now $867.76. Escrow balance is now $1,877.07. No payment posted on statement as expected due to non-payment from Plaintiff for October 2010. Past due payment amount is $6,066.35. This is the exact amount that was past due on statement dated 03/30/2010 (see 03/30/2010 statement attached as Exhibit X ). Now, once again it insinuates that Plaintiff is behind approximately five (5) months, again. At this time the Plaintiffs are officially behind three (3) months. Payments missing so far were for November 2009, September 2010 & October 2010.

46. For monthly statement dated 11/29/2010 (see attached statement as Exhibit AM ), payment due December 1, 2010 is for $1,407.39. Escrow balance is $306.49. Property taxes were paid by BAC from Plaintiff's escrow account in the amount of $1,513.22 which was once again lower than the previous year. No payment was posted for November 2010 as can be expected because Plaintiffs were not able to submit the payment due to financial difficulties. Past due payment amount is now $7,279.62. This is stating that Plaintiffs are six (6) months behind. At this point, Plaintiffs are actually four (4) months behind.

47. Both Plaintiffs have suffered severe anxiety, depression which includes suicidal thoughts and health issues as a result of these practices. Health issues include Hypertension (Isabel Santamaria) in which Plaintiff almost had to be taken to the Emergency Room several times,

Chronic Fatigue Syndrome and heart palpitations. These physical conditions are documented by her Primary Care physician Dr. Judy Mayor-Davies. Chronic Fatigue Syndrome is caused by high levels of stress. Plaintiff (Isabel Santamaria) had depression so severe that at times was not able to get out of bed to get her children ready for school. Plaintiff drives her children to school. Plaintiffs mother also had to come several times from Miami in order to assist her daughter with her daily activities due to Plaintiffs' severe anxiety and depression. Plaintiff (Abdiel Echeverria) has suffered severe mental distress which includes suicidal thoughts and stress so severe that he developed what is believed to be Shingles. Shingles is triggered by stress levels so high that the body then reacts this way. Plaintiff (Abdiel) experiences chronic pain and burning on an every day basis due to possible Shingles. Some days are better than others. Plaintiff (Abdiel) has also been observed at work with severe anxiety and tremors. Plaintiff (Isabel) has suffered such severe depression and anxiety that she has been under the care of a Psychologist for several months. Psychologist Dr. Kathy Pierce has expressed concern for her mental well being. These medical conditions have been deemed costly and have been extra expenses that the Plaintiffs could not afford. Most of these conditions have dramatically decreased the Plaintiffs quality of life. The Plaintiffs have also suffered marital problems due to these practices. Lack of intimacy is a major issue. Sharing much needed quality time with their children as before is also an issue. Plaintiffs have endured threats, lies, negligence and abuse by the Defendant BAC.

48.   Plaintiff received "Notice of Intent to Accelerate" as soon as January 6, 2010 (see attached Notice as Exhibit O ) when Plaintiffs were only one (1) month behind. Plaintiffs have in their possession Notices of Intent to Accelerate dated: January 6, 2010; April 21, 2010 (see attached Notice as Exhibit AN); May 10, 2010 (see attached Notice as Exhibit AO ); June 25, 2010 (see attached Notice as Exhibit AP ); July 30, 2010 (see attached Notice as Exhibit AQ )

and September 10, 2010 (see attached copy of Notice as Exhibit AR ). These Notices of Intent to

Accelerate were sent by the Defendant, BAC via certified mail. Plaintiff recalls receiving at least

one more Notice of Intent to Accelerate but seems to have lost or misplaced it at the time this

complaint was filed. On each and every one of these Notices, Plaintiffs are given a date of when

the foreclosure process will commence unless the Defendant receives the erroneous amount

stipulated on the Notice from the Plaintiffs.

49. Plaintiff (Isabel Santamaria) had a not-so friendly encounter with one of the Bank of

America female representatives in late 2009 or early 2010. This BAC representative felt that it

was necessary to place the Plaintiff in a line of questioning to entrap her. The conversation

(might differ slightly from actual record) is as follows: *Representative*: "How big is your house?"

*Plaintiff*: "More than 2,200 square feet." *Representative*: "That is a pretty big house. How many

bedrooms and bathrooms does it have?" *Plaintiff*: "Four bedrooms and three bathrooms".

*Representative*: "That's good. How many people are living in your household?" *Plaintiff*: "My

husband, son, daughter and myself." *Representative*: "So, there's a total of four people living in

your home. That means that you and your husband have one room, each child has a room each

and there is an extra room and an extra bathroom. That means that you can rent the remaining

bedroom with a bathroom and that will help you pay your mortgage." Plaintiff became upset at

this misleading line of questions. Plaintiffs utilize every room in this house. Furthermore, it is not

acceptable that a representative give her personal opinions. Due to having small children

especially with disabilities, it is not recommended or wise that the Plaintiffs rent out part of their

home to a possible stranger. The representative was clearly out of line. Bank of America is

responsible for such behavior by their employees. Bank of America is also responsible for not

properly training their employees. BAC's representatives will repeatedly provide inaccurate

information to its customers. This is a clear case of "quantity over quality." *According to legal doctrine often called "respondeat superior", an employer is legally responsible for the actions of its employees during the scope of his or her job, carrying out company business, or otherwise acting on employment. Misconduct and acts of negligence displayed by an employee will hold the employer responsible if these are being executed while said employer was doing the employer's behalf when the incident took place.*

50.  According to Real Estate Procedures Act § **3500.17 Escrow accounts.** (2) *Surpluses.* (i)  If an escrow account analysis discloses a surplus, the servicer shall, within 30 days from the date of the analysis, refund the surplus to the borrower if the surplus is greater than or equal to 50 dollars ($50). If the surplus is less than 50 dollars ($50), the servicer may refund such amount to the borrower, or credit such amount against the next year's escrow payments. Furthermore, Defendant did not post some escrow payments to Plaintiffs escrow account. Plaintiff indeed had an overage due to them for over $800.00. As seen in Plaintiff's Payment History with BAC (see payment history as Exhibit AS), Defendant did not post anything on Escrow for the month of December 2009 even though payment was indeed received that month. No escrow payments were initially posted for February 2010, March 2010 or April 2010 even though payments were also received. Escrow payments were then later posted on April 20, 2010. This particular Payment History was sent to Plaintiff's Attorneys in May 2010. Escrow payment for December 2009, remained un-posted. The most recent Payment History was printed and is included with this complaint to debate any future corrections by Defendant BAC (Bank of America) before this case is heard in a Court of Law. Corrections to the Escrow account were supposed to be corrected many months ago. Requests were also sent by QWR's (Qualified Written Requests) and also by Plaintiff's Attorney at the time, Angela Sigman Esq.

51. In April 2010, Plaintiffs hired an Attorney from law firm Enrique, Smith & Trent P.L. Plaintiffs were able to hire an attorney even with their limited financial means because they have a legal plan with Hyatt Legal through Plaintiff's (Abdiel) employer (Waste Management). Plaintiff hired the attorneys to help them with their loan modification and to help them correct their account with Bank of America. Plaintiffs felt that the consistent negligent behavior by Bank of America needed further action at this time. Plaintiffs became tired, anxious and severely stressed dealing with these issues by themselves. By this time Plaintiff had already warned Bank of America several times to correct their account (see letter dated March 19, 2010 as Exhibit AT). Also on March 11, 2010, Plaintiff submitted an email via Bank of America's website www.bankofamerica.com in order to correct the issues (see email to BAC dated 3/11/2010 as Exhibit AU). Plaintiff was irate when she typed this email and could not believe the constant abuse by BAC. Plaintiff also expressed in this email that she would soon have legal representation. Plaintiff also spoke to a representative this day (March 11th) as documented in the email regarding her account. Defendant BAC answered this email on 03/30/2010. Bank of America wanted the Plaintiff to call customer service so that she can obviously be abused and lied to as in previous occasions. Plaintiff had already expressed that she no longer feels healthy enough to speak to Bank of America and would prefer communication by mail or email.

52. As previously stated according to Payment History with Bank of America (see Payment History attached as Exhibit AS), no payments were posted February 2010, March 2010 and April 2010. These payments were submitted on the first week of each month but were not posted at all. Once Defendant BAC ("Bank of America") was advised that the Plaintiffs already had legal representation, they decided to post the three payments for February, March and April 2010 on

the same day. These three (3) payments were posted on April 20, 2010. Bank of America's

malicious and deceitful intentions were evident. Bank of America had every intention in keeping

that money and remove the Plaintiffs from their home.

53.     The few times that Plaintiff received letters, the information was vaguely worded and

contradicted what she was told over the telephone. For example, on or about February 20, 2010

Plaintiff was told over the telephone that Defendant BAC had not received the financial

documents that she had sent. Other times this month (February 2010) she was told that they did

receive the information. Other times Plaintiff would call again and would be told that they never

received anything and that nothing shows up in their system. At the end of this month (February

2010), Plaintiff received a letter dated February 23, 2010 (see copy of February 23, 2010 letter as

Exhibit S ) which advised that Defendant BAC did not receive all the applicable financial

documentation requested from the Plaintiff. Plaintiff made sure that she sent everything

requested all previous times. Plaintiff has clerical knowledge and is familiar with secretarial

work which involves submitting documents. Regardless, Plaintiff submitted all documents

requested again. Subsequently, she received a letter dated March 31, 2010 (see copy of letter

dated 3/31/10 as Exhibit AV ) stating that Plaintiff's financial documents were received on

February 5, 2010. This letter was received in April 2010. During these two (2) months the

Plaintiffs were provided conflicting information regarding their financial documents and no one

would provide more information than the usual "it's currently being reviewed" answer.

54.     For the month of March 2010, Plaintiff called several times to check on status of loan

modification and to complain about incorrect past due balances again. As per representatives,

there were no updates regarding the loan modification. Plaintiff called Defendant Bank of

America about her payment history and postings. Representatives did not help the Plaintiff and the web of lies continued. Plaintiff was never able to resolve anything over the phone and would become extremely ill. On this day, (March 11, 2010) Plaintiff expressed her disgust with the company and how they were handling her account and situation when she wrote an email to Bank of America on their website (again, see copy of email dated 3/11/10 as Exhibit AU ). Defendant BAC responded more than two (2) weeks later acknowledging that she did speak to a representative that day about her payment history. They also stated that if she had any further concerns to call Customer Service at (800) 669-6607. Plaintiff knew at this point that once again calling would be a waste of time and would continue to jeopardize her health.

55.   In April 2010, Plaintiff (Isabel Santamaria) called Bank of America and spoke to a male representative. Plaintiff advised the representative that as of April 24th, she will no longer be sub-contracted with her current employer and that her financial situation will be even more critical and therefore needed assistance as soon as possible. Plaintiff also complained about the incorrect amounts that they owed and about the escrow account. This representative continued to provide erroneous information to the Plaintiff about their account.

56.   On April 19, 2010, Plaintiff receives a Fed Ex envelope with a letter from Bank of America from Ezila Lutcher (see copy of letter from Ezila Lutcher as Exhibit AW) in which she requested that Plaintiff send all documentation all over again. Mrs. Lutcher also requests a contact number stating that she has been trying to reach the Plaintiff about a "possible" loan modification. Plaintiff submitted all documents again via the pre-paid Fed Ex envelope provided. In this envelope, Plaintiff submitted all forms and updated financial information along with the letter she typed back on March 19, 2010 and sent to Defendant BAC again just in case this

written request was being ignored again. At this time, the Plaintiffs had already initiated the

hiring of legal representation and faxed authorization to Attorney so that they can start dealing

with Bank of America (BAC). Plaintiff did not want to deal with Defendant BAC ("Bank of

America") antics any longer without the assistance of an Attorney.

57. On April 19, 2010 Plaintiff submitted an email to Barbara Desoer and it is confirmed by

the letter stated below. On this day Plaintiff also submitted an email to BAC CEO Brian T.

Moynihan at brian.t.moynihan@bankofamerica.com. Emails were also sent to Mr. Moynihan on

July 19, 2010 and August 1, 2010. All three (3) emails to Mr. Moynihan are attached as Exhibit

AX. A letter dated April 21, 2010 was received on or around April 25th from Claudia De Leon

Customer Advocate (see copy of letter dated April 21, 2010 as Exhibit AY). This letter states

that Ms. De Leon was trying to contact the Plaintiff. Plaintiff was not aware of such attempts.

Around this time, Plaintiff had already requested legal representation. Ms. De Leon's letter also

states that in order to "review" your request for payment assistance, the Home Retention

Division will need updated financial information, again. This is already the fourth (4) time that

the Plaintiff submitted this information.  Plaintiff also tried to fax to the fax number provided

(1.866.786.8563) but once again it was not a working fax number. Plaintiff was left to wonder

what happened to all of the documentation provided so far over the past few months and that her

request will once again be "reviewed". Again, Plaintiff was pre-qualified for a loan modification

in January 2010. By this time, four (4) crucial months have already gone by for the Plaintiff.

Plaintiffs continued to make regular payments that they could no longer afford.

58. In May 2010, Plaintiff's Attorney requested payment history for their client from

Defendant Bank of America (see copy of payment history dated 05/10/2010 as Exhibit AS ).

Attorney Angela Sigman called Plaintiff (Isabel Santamaria) and asked her why she sent three

(3) payments on the same day (April 20, 2010) instead of these three (3) payments being sent on

the correct months (early February, March & April). Plaintiff's Attorney asked this because she

was advised previously by the Plaintiff that she was submitting payments every month to Bank

of America. Plaintiff was shocked and extremely upset with this information because she had

submitted a payment for each month and their payment history was saying otherwise.

59. Defendant BAC ("Bank of America") will send a home inspector every month to inspect

the property. Plaintiffs were never aware that this would be done with such frequency. Plaintiff

also wondered how they would be affected monetarily by these inspections. Bank of America

sub-contracts these inspection companies and there will be a fee. The more inspections are

performed, the more it will cost financially. Plaintiffs were embarrassed every time the inspector

would come to their property because it became evident to the neighbors what was going on even

though the Plaintiffs did not want to disclose this information to their neighbors. Plaintiff has

seen and spoken personally to the female inspector. The Inspector's name is Cheryl H.

60. On July 10, 2010, Plaintiff submitted a written request via certified mail to Defendant

BAC so that they can submit a copy of the original Promissory Note within 10 days (see attached

letter as Exhibit AZ ). This letter was mailed out on that same day. The Plaintiff requested that

the copy be forwarded to their Attorney. On the 10th day after the letter was received by the

Defendant, Plaintiff submitted an email to BAC requesting some type of acknowledgement of

the letter sent. A few days later Bank of America responds with the email attached as Exhibit

BA. Bank of America states that loan is old and therefore the documents are not scanned in their

system (see email response from BAC regarding Note as Exhibit BB). At the time, this loan was

only a little over two (2) years old. Plaintiff is later told by BAC that their Note will be sent. A few days later Plaintiff receives something that looks like a statement with details about their loan (see notice sent by BAC dated August 03, 2010 as Exhibit BC ). Plaintiff complains via email to BAC as seen in Exhibit BB. This is not the Promissory Note that Plaintiff had requested. This notice also continues to state that Plaintiff continued to be several payments behind by stating that last paid installment was on April 1, 2010. Furthermore, Defendant is charging Defendant $5.00 for this Notice which is not what the Plaintiff requested even though BAC insists otherwise. Finally, a COPY of the original signed Promissory Note was sent to Plaintiff (see attached copy of Note with cover page letter as Exhibit BD ). This was dated October 22, 2010. Plaintiff fails to understand why this took so long and where did the Defendant actually obtain this Note. Plaintiff is also not aware if Defendant truly holds the "Original" Signed Promissory Note and not just a "Copy" of the Original. According to RESPA laws, the Defendants were supposed to acknowledge the Plaintiffs written request within 20 days and produce the note within 60 days. They produced a "**copy**" of the Note more than 90 days later.

61. A demand letter dated August 16, 2010 was sent to Defendant Bank of America (BAC) by Attorney Angela Sigman on behalf of the Plaintiffs (see copy of demand letter as Exhibit BE). Ms. Sigman emailed a copy of the letter to the Plaintiff before making minor corrections. This is the letter attached. The letter was addressed to Craig Jernigan, Office of the President. Bank of America *refused* to comply with any of the requests of this demand letter. Plaintiffs gave Bank of America numerous opportunities which expanded many months to correct these issues.

62. As previously stated in paragraph 41 of this complaint, Plaintiff submits a letter to Bank of America dated June 15, 2010 (see attached letter as Exhibit AC ). In this letter Plaintiff is

advising Defendant Bank of America (BAC) that they will be submitting a payment late this

month due to their continued financial difficulties. Plaintiffs continued to ask for assistance as

quickly as possible so that they do not default anymore because they are no longer able to afford

their regular payments. Plaintiffs continued to advise that they will continue to fully cooperate in

sending documentation for a loan modification which was currently being handled by their

Attorney. Plaintiffs never had the intention of not paying their mortgage as can be seen by their

perfect payment history with Taylor, Bean & Whitaker and consequently with BAC and were

making extraordinary efforts to try to continue to make mortgage payments that they could no

longer afford for many months. Plaintiffs persistently made requests to Defendants BAC for

assistance. Plaintiff (Isabel) also continued to advise of her medical condition which is being

caused and aggravated by Bank of America's intentional practices. Payment was submitted to

Defendant on June 18, 2010, only two days late.


63. On May 25, 2010, Plaintiff submits a complaint to Florida Attorney General Bill

McCollum. Plaintiff complains of Bank of America's malicious practices in regards to their loan

modification, escrow and payment history. Charlene German at The Attorney General's office

responds to the email on June 11, 2010. The Attorney General suggests that Plaintiff contact the

OCC (Office of the Comptroller of the Currency), HUD and other resources.  Months later,

Plaintiff sent another email to the Attorney General on September 8, 2010 advising that even

though her loan was in Bank of America's Office of the President since Early June 2010, nothing

has been done. Plaintiff also states in this email that they might be victims of discrimination

because of the complete disregard they have experienced. On September 15, 2010, Carmen

James replies to the Plaintiffs email. The Attorney General asks that she reply. She states that she

is forwarding the Plaintiffs' correspondence to the Economic Crimes Unit. Complete email conversations between the Plaintiffs and the Attorney General's Office is attached as Exhibit BF.

64. On June 21, 2010, Plaintiff (Isabel Santamaria) calls the Hope Hotline 888-995-HOPE. Plaintiff was provided with client number 15894595-1. Plaintiff speaks with Sarah McCoy. Plaintiff expresses her concern regarding Bank of America and her loan modification. Sarah McCoy calls Bank of America with the Plaintiff on the line. Sarah McCoy was told by a representative named Caleb that the Plaintiff's file was in the Office of the President. Caleb then transferred the call to the Office of the President. Misha (Meesha) Smith in the Office of the President answered the call. Mrs. McCoy began to ask Mrs. Smith questions regarding the Plaintiff's loan modification. Mrs. Smith said that she had no information. Nothing was mentioned about a "Special Forbearance" or any other program. Plaintiff then jumps in and starts asking about her account issues and Mrs. Smith also states that she has no information but that the account is currently being investigated and she (Mrs. Smith) assured them that there will be a resolution by the following week. Plaintiff was told by Sarah McCoy that this phone call was recorded. Plaintiff continued to wait and she never received a resolution as promised by Mrs. Smith for many weeks or months after that call.

65. Plaintiff receives a letter from Defendant BAC dated July 22, 2010 that states that their correspondence was received. Plaintiffs "request for assistance, along with their personal financial information has been received " (see letter from BAC dated July 22, 2010 as Exhibit BG ). This letter also confirms the receipt of the letter faxed to Defendant BAC on July 20, 2010. On this same letter from BAC (Exhibit BG), Defendant states under <u>What You Need to Do:</u> "Please be aware that receipt of your documentation **starts** the review process, which may take

up to 45 days to complete." Plaintiff is left confused by this statement and asks herself: "Didn't

our loan modification process start on February 5, 2010 when Defendant BAC initially received

our documentation?" and "Why has it taken so long when it should take no more than 45 days to

complete as per this letter?" and "How many times has BAC **started** my *review* process

considering the fact that we already sent all our documents many times already?" By this time,

more than six (6) months have gone by with no results on a loan modification.

66. As of July 2010, Plaintiffs continued to receive statements with wrong amounts due. So

far, nothing has been resolved as promised by Misha (Meesha) Smith. Plaintiff sent email to

Senator Bill Nelson and Congressman Bill Posey on July 22nd. Plaintiff received a quick

response from The Honorable Bill Posey on July 25, 2010 with a letter dated July 23, 2010 (see

letter from Congressman attached as Exhibit BH ). Mr. Posey sent the Plaintiff forms to fill out

with all the loan info. Plaintiff faxed all requested forms to the Congressman along with a letter

dated July 26, 2010 attached as Exhibit BI. Plaintiff receives a letter from Congressman Bill

Posey dated July 27, 2010 (see letter attached as Exhibit BJ ). He confirms that paperwork was

received and that he will be contacting the Office of the Comptroller of the Currency (OCC) on

her behalf. On August 7, 2010, Plaintiffs received another letter from Congressman Bill Posey

along with a letter from the Office of the Comptroller of the Currency dated August 2, 2010

stating that they have opened a case (see attached letters attached as Exhibit BK). Case number is

01242240.

67. On September 27, 2010, Plaintiffs finally receive a response about their loan

modification. This notice was sent in a Fed Ex envelope by the Defendant BAC (see letter from

BAC dated September 27, 2010 attached as Exhibit BL). The letter states that the Plaintiffs are

**denied** a loan modification because: "you did not provide us with the documents we requested." Plaintiffs became very upset at this flagrant excuse provided by Defendant as can be expected. Plaintiffs found this as being deceitful because Plaintiffs continued to submit updated financial paperwork every month since the loan modification process was initiated in January 2010. Even though paperwork was lost many times by the Defendant, Plaintiffs also have confirmations sent by Bank of America that documents were received. Furthermore, Defendants did not request any additional paperwork from the Plaintiff's Attorney. BAC (Bank of America) continued to lose documentation, request documentation and receive documentation for many months.

68. Plaintiff noticed on escrow's "Step by Step Analysis" printed on 10/3/2010 from Defendant Bank of America's website, that Bank of America initiates (beginning balance) the Plaintiffs escrow account in August 2009 with a substantially less amount than it really was. It was more than a $1,000.00 difference. See attached Analysis as Exhibit BM. In review, on Escrow Account Review dated 10/09/2009 (Exhibit E), beginning balance on escrow is $3,844.29. In addition there is also an escrow shortage on this statement of $1,039.95 being charged to the Plaintiff as well which is a major discrepancy. On Escrow Account Review dated 11/10/2009 (Exhibit L), starting balance for escrow is $3,394.39. On Escrow Account Review dated 12/22/2009 (Exhibit M), starting balance for escrow is now $2,406.79. For Escrow Account Review dated 01/15/2010 (Exhibit N), Beginning Balance is now $1,362.78. Beginning balance for escrow is never supposed to change only the current balances for the current months can change.

69. In November 2010, Plaintiff begins to review the Promissory Note and noticed that it states in part (B) Default: "This note does not authorize acceleration when not permitted by HUD

regulations." Plaintiff found this statement to be interesting because they received a Notice of

Intent to Accelerate soon after they missed their first payment (November 2009). Plaintiff

decided to look further into this and found several pieces of information that stated that a lender

cannot intend to accelerate unless the borrower has already defaulted a minimum of three (3)

payments. Plaintiffs have been receiving Notices of Intent to Accelerate "prematurely" since

December 2009. These notices have been malicious threats with incorrect amounts due every

time. Plaintiff decided to call FHA in November 2010 and ask this question along with a

complaint against Bank of America. Plaintiff called (877)622-8525 and spoke to a gentleman

named Sean in the Tulsa office. She gave him her FHA case number and told him what was

going on. He was very willing to help her and even asked if they bring her up to date with her

mortgage, could they be able to make their regular payment. The Plaintiff was honest and told

him that she appreciated the offer but that she could not afford her payment for more than 18

months now and that is why she was asking for the loan modification in the first place. She also

told him that she knew that eventually Bank of America would find the way for them to

eventually lose their home anyway. The FHA agent told the Plaintiff that according to Bank of

America, they were currently 5 months behind. November had just started so that means that

Plaintiffs will be 6 months behind according to Bank of America. The information that Bank of

America has provided the Federal Housing Administration is false. Plaintiffs have received

acceleration notices almost a year ahead of time which has caused them great aggravation. They

have felt persecuted and targeted. Plaintiff also confirmed with the FHA agent regarding this and

he stated that a lender/mortgage company cannot send a Notice of Intent prematurely (before 3

months of non-payment) because it is against FHA regulations. The agent wrote down

everything that the Plaintiff was saying and provided her with ticket # 156138 and told her that

she would be getting a call within 48 hours to follow up. Shortly after that same day at 3:50 pm est, the Plaintiff received a call from Michelle Rude (HUD) and the Plaintiff told her what was going on. Plaintiff told her that even though she called them it was mainly to complain because she knew that Bank of America was really not going to help them and that they needed to be held accountable for breaking laws. Ms. Rude provided the Plaintiff with her direct line (405) 609-8492 and told her that she will check on the status of the loan anyway. Plaintiff called back a week later and Michelle Rude (HUD) said that they still did not have a response from Defendant Bank of America, she said that oddly it has taken longer than usual. Plaintiff was not surprised. Approximately two weeks later, Michelle Rude provides the Plaintiff with an update. She told the Plaintiff that as per Bank of America, Plaintiffs were not currently in foreclosure and that she (HUD) could help them with submitting the documents again to Defendant BAC for a loan modification if needed. Plaintiff thanked Mrs. Rude but explained that Bank of America will just give them the usual run-around and eventually foreclose on their home while in the loan modification process. By this time, Plaintiff is totally convinced that the loan modification process by Defendant BAC is all a scam.

70. On December 3, 2010, Plaintiffs receive a four (4) page letter dated November 24, 2010 from Scott McDaniel (Customer Advocate) in the Office of the CEO and President to finally "address" their concerns (see attached letter dated November 24, 2010 as Exhibit BN ). The allegations and facts of this letter are as follows:

1). This letter only acknowledges receipt of one of the three emails sent to Mr. Brian Moynihan (CEO). Mr. McDaniel also states that they do not have records of any qualified written requests. Plaintiffs submitted countless letters, emails and even a Demand Letter from their Attorney demanding that our account errors be fixed. Mr. McDaniel also states that there is

no violation of the Settlement Procedures Act for which the evidence proves otherwise.

2). Mr. McDaniel also states that they never lost any of the Plaintiffs documents. BAC did acknowledge several times with previous letters sent to the Plaintiffs that they received these documents but have also told the Plaintiff several times that they never did. Bank of America consistently loses customer's documents and the Plaintiff's are willing to also provide evidence of other victims who have experience the same "run-around" with Defendant BAC which will demonstrate a pattern of malicious conduct by the Defendant BAC.

3). BAC also states in this letter that the Plaintiffs are currently 6 payments behind as of November 1, 2010. In reality, Plaintiffs initially missed one payment (November 2009), continued to make their regular payments and then began to default again in September 2010. In reality Plaintiffs were four (4) months behind as of December 1st.

4). This letter also states that they acknowledge the surplus in their escrow for 2009 but it was never returned to them because Plaintiffs were in default. However, Plaintiffs continue to confirm that money is indeed missing from their escrow account. Defendant BAC had failed to post money in escrow from payment they received in December 2009 from the Plaintiffs. Beginning balances for Escrow changed numerous times as previously stated which makes the activity on Plaintiff's account suspicious.

5). This letter also states that the Plaintiffs requested help 3 times (October 15, 2009; October 30, 2009 & November 10, 2009) for which they were found to be ineligible because their monthly payment was 29% of their gross monthly income. The letter then continues to state that on January 12, 2010, the Plaintiffs requested assistance again and that they met the requirements and were pre-qualified. This part is true. However, according to the report given by BAC ("Bank of America") to the Comptroller of the Currency (OCC), the facts are very

different. On the letter dated December 1, 2010 from the Office of the Comptroller of the Currency (OCC) addressed to Congressman Bill Posey (see attached letter from the OCC as Exhibit BO ), they state that the Plaintiff could not qualify for a modification due to their financials. The letter also states that the Plaintiffs have already received a Type II Special Forbearance Workout plan while their mortgage investor (Ginnie Mae) continued to review them for final mortgage modification. These statements contradict one another. Plaintiffs do not qualify because of their financial documents but they are in a Special Forbearance Workout plan and are being reviewed for a "final" modification? Does this also mean that the Plaintiffs were in a "trial" modification of some sort and were never advised by the Defendant BAC? Plaintiffs had no idea which statement is true. It is disturbing that the OCC did not pick up on these discrepancies. In addition, Plaintiffs were NEVER advised that they were in some type of workout plan and that they even had an investor (Ginnie Mae). This was the first time they ever heard of this. Furthermore, their Attorney at the time was never advised as well. Plaintiffs were always kept in the dark about their loan modification process.

   6). In addition, Plaintiffs were already sent a denial letter dated September 24, 2010 that they (BAC) are not able to provide them with an FHA- Home Affordable Modification because the Defendants BAC had not received the documents requested, this contradicts the other excuse provided to the OCC by Defendant BAC. Plaintiffs are left to wonder if BAC provided this information to the OCC to cover up their true intentions since they were being investigated.

   7). Bank of America (Scott McDaniel) states that they reversed three (3) payments that were all posted incorrectly on April 20, 2010 and that they were posted correctly (February 2010, March 2010 & April 2010). Mr. McDaniel included in the letter the payment history which does not show that any significant corrections were made as stated in the letter (see attached payment

history sent by Mr. McDaniel as Exhibit BP ). Also, Plaintiff printed their transaction history on www.bankofamerica.com on December 27, 2010 and the posting remains the same (see online transaction history dated 12/27/10 as Exhibit BQ ). Plaintiff printed it as evidence in case Defendants decide to make adjustments after this complaint is filed.

8). Mr. McDaniel also states that Notices of Intent to Accelerate were only sent out to the Plaintiffs on April 21, 2010; May 10, 2010; June 25, 2010, July 30, 2010 and September 10, 2010. He fails to state that the Plaintiffs started receiving these "Notices of Intent to Accelerate" as soon as December 2009 and Plaintiff continued to receive them during the entire loan modification process. Plaintiff has in their possession a Notice of Intent to Accelerate dated as early as January 6, 2010. Bank of America "denies" any allegation of fraud or discrimination in this letter even with all the sufficient evidence of fraud at hand.

71. Plaintiff proceeded to write a letter dated December 6, 2010 in response to Mr. McDaniel's letter dated November 24, 2010 and sent it certified mail on December 8, 2010 (see attached letter dated 12/6/10 as Exhibit BR ). Defendant BAC received certified letter from Plaintiff on December 10, 2010 (see attached copy of certified receipt dated 12/10/2010 as Exhibit BS). Plaintiff also sent a copy of this letter via fax to the OCC and the Attorney General that same day so that they can see that their case was not properly evaluated and that there is indeed deception regarding their account. Plaintiff also faxed a letter to Congressman Bill Posey addressing their disappointment about the OCC's evaluation response on December 8th. The Office of the Comptroller of the Currency was obviously misinformed by the Defendant BAC. Plaintiff refused to accept Bank of America's allegations and therefore wanted to dispute and advise all parties involved in this case. Plaintiff also submitted an appeal to the Office of the Comptroller of the Currency on December 17, 2010.

72. On January 22, 2011, Mr. Hector Rodriguez who is the Plaintiff's neighbor across the street, knocks on their door very concerned. Plaintiffs had just arrived home. He stated that a few minutes before the Plaintiffs arrived, there was a short lady in a blue car taking pictures of their house. He also states that after she finished taking all the pictures, she proceeds to knock on the Plaintiff's door but they were not at home at the time. Plaintiff's neighbors know what is going on because of Bank of America. Plaintiffs' privacy has been compromised.

73. On January 25, 2010 at 6:59 pm est, Plaintiffs receive a call from the President's Office at Bank of America. Plaintiff Isabel Santamaria answered the call. A female representative by the name of Gloria Perez was asking for Plaintiff Abdiel Echeverria. She begins to **offer** the Plaintiff a Special Forbearance Program. Plaintiff is astonished that he would receive this call two (2) weeks after the Defendant BAC received the summons. The Plaintiff proceeded to tell Ms. Perez that they no longer need this "so called" assistance because they filed a lawsuit against them last month. Ms. Perez acted surprised and stated that they had "no idea" that there was a lawsuit filed against them by the Plaintiff. The Plaintiffs never provided the Defendant BAC with their new current telephone number. This telephone number (321-676-4198) was indeed listed on the legal documents served to the Defendant BAC on January 11, 2011 and that is how they obtained this contact number for the Plaintiffs. Plaintiffs have never before been contacted by Defendant BAC at this current telephone number that they are aware of. Therefore, it is quite obvious that Defendant BAC's Office of the President was already aware of this summons and tried to make a malicious "attempt" to resolve this situation and avoid litigation.

74. In the later part of the morning of January 26, 2010, Plaintiff Abdiel Echeverria receives a call on his cellular phone but was not able to answer it. A few minutes later he opened his voicemail and there was a message from Defendant BAC's Attorney, Jessica Gavrich regarding the Plaintiff's complaint. There was also an email from Ms. Gavrich stating that this complaint was received in her office the day before (January 25, 2010) and she was asking that the Plaintiffs give her more time to answer the complaint because it was very extensive. The Plaintiffs gladly complied to Ms. Gavrich's request and understood the reason for her request. The Plaintiffs felt that Ms. Gavrich was acting in good faith and was being honest about her receipt of the complaint the day before. It became obvious that the Defendant BAC had in their possession the summons on the day and most likely many days before Ms. Gloria Perez from BAC's Office of the President called the Plaintiffs. Plaintiffs find this course of conduct by Defendant BAC as deceitful and an indication of their guilt. Defendant BAC did not take the appropriate actions after receiving the summons (which itself initiates the lawsuit) by contacting the Plaintiff directly without legal representation and in addition providing a false statement regarding the receipt of the summons to the Plaintiffs during that phone call on January 25, 2011.

75. Plaintiffs were in constant stress awaiting the moment that they would receive a Foreclosure Notice. Plaintiffs imagined the loss of their home and the uncertainty of where they would live. Plaintiffs have two (2) large dogs that will most likely not be allowed in a rental home. Plaintiffs love their dogs and have invested money and love in their care. Plaintiffs cannot imagine taking their healthy dogs to a shelter and having them euthanized. Furthermore, Plaintiffs do not have the funds for a deposit on another home or rental at this time. Their credit

is further ruined by BAC's practices that it will make it impossible for them to rent a home if there is a credit check involved. Due to Defendant BAC's practices, it is very likely that the Plaintiffs will never be able to purchase a home again. Most importantly, Plaintiffs have two (2) small children who have special needs and need a stable home. Their six (6) year old son is Autistic and their ten (10) year old daughter has Asperger's Syndrome. Plaintiffs do not currently receive any monetary assistance for their children. Defendant BAC, was aware of Plaintiffs' special needs children and were also aware that they do not receive monetary assistance for their care.

76. Plaintiffs have acquired personal debts in order to continue to make their mortgage payments for many months while waiting for a payment reduction from Defendant BAC. Plaintiffs have had to ask for personal loans from family members to cover their monthly expenses. Plaintiffs also owe money to a family member because they needed tires for their car. Their tires were so damaged that the vehicle was not safely operational. Plaintiffs still owe this money. Plaintiffs feel embarrassed by their financial situation and the need to ask for personal loans from family members. These are not luxuries, these were needed necessary expenses. Plaintiffs have also had to sell personal property with sentimental value in order to cover their everyday expenses. Defendant BAC was warned many times by the Plaintiffs that they were in dire straights and that they needed assistance as soon as possible. Regardless, Defendant BAC continued to prolong the loan modification process as long as possible by losing their financial documents and requesting paperwork over and over again. This was all done with the intention

that the Plaintiffs would fall deeper and deeper in debt and continue to default again. This was a callous and malicious plot by the Defendant BAC.

## VI. CAUSES OF ACTION

### Count 1: Violation of the Real Estate Settlement Procedures Act (RESPA)

77.   The allegations of paragraphs 13 -73 above are re-alleged and incorporated by reference herein.

78.   Defendant BAC is a servicer of a federally related mortgage loan within the meaning of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605. Defendant BAC's conduct has violated RESPA in the following respects:

### RESPA Count: Part A

79.   Plaintiffs Abdiel Echeverria & Isabel Santamaria sent Defendant BAC written applications for a loan modification, including a hardship affidavit, and written submissions of financial information that were "qualified written requests" within the meaning of RESPA, in that
Plaintiffs sought information about their eligibility for a loan modification or other methods to minimize their losses.

80.  Plaintiffs' letters dated March 11, 2010; March 19, 2010; April 19, 2010;  June 15,

2010; two (2) on July 19, 2010 (written letter to BAC & email sent to Mr. Moynihan); July 20,

2010; August 10, 2010 (email); August 13, 2010 (email) and August 16, 2010 (Demand Letter

by Attorney Angela Sigman) were all written request for an investigation of misrepresentations

made by Defendant BAC with respect to their mortgage account was a "qualified written

request" within the meaning of RESPA. In addition, RESPA does not require that a party send a

qualified written request through certified mail or by facsimile in order to prove receipt.

Nevertheless, Plaintiffs do have proven documentation. Defendants were also advised by other

resources such as The Florida Attorney General, Congressman Bill Posey, OCC and Better

Business Bureau among others of Plaintiffs ongoing difficulties and issues with their company.

In addition, Plaintiffs did not receive the requested documentation (Note) within the RESPA

sixty (60) day requirement and acknowledgement by the Defendant was received after 20 days.


81.  Defendant BAC failed to respond in a proper and timely way to Plaintiffs'

"qualified written requests" for information about their mortgage accounts by failing to provide

Plaintiffs with the information requested or explain why the information sought was unavailable,

in violation of 12 U.S.C. § 2605(e).


### RESPA Count: Part B


82.  In addition, Defendant BAC failed to send notice of transfer of loan servicing to

Plaintiffs within 15 days after the effective date of transfer of the servicing of the mortgage loan,

in violation of 12 U.S.C. § 2605(c).

**Damages**

83.   Plaintiffs suffered damages including, but not limited to loss of credit, emotional harm, additional medical expenses, embarrassment and humiliation. Plaintiffs also incurred health issues due to Defendants malicious practices.

84. Plaintiffs' damages were proximately caused by Defendant BAC's noncompliance with the requirements of the mortgage servicer provisions of RESPA.

85. Defendant BAC has engaged in a pattern and practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA, and Plaintiffs seek $1,000 in statutory damages per violation.

**<u>Count Two: Breach of Contract- Promissory Note & Mortgage</u>**

86.   The allegations of paragraphs 13-73 above are re-alleged and incorporated by reference herein.

87.   The Promissory Note signed by Plaintiffs to create and secure the indebtedness on their home constitute an enforceable contract. A copy of the Note is attached as Exhibit BD. As an FHA-insured loan, it states that compliance with HUD regulations is a precondition to foreclosure:

"In many circumstances regulations issued by the Secretary [of Housing and

Urban Development] will limit Lender's rights, in the case of payment defaults, to

require immediate payment in full and foreclose if not paid. *This Security*

*Instrument does not authorize acceleration **or foreclosure** if not permitted by*

*regulation of the Secretary [of Housing and Urban Development].*" Defendant BAC has not

complied with the regulations promulgated by the Secretary of Housing and Urban Development

and as such, foreclosure is not an available remedy at this time.

88.   HUD has plainly stated: "[I]t is the intent of the Department that **no mortgagee**

**commence foreclosure acquisition of a property until the requirements of this subpart have**

**been followed.**" (emphasis added) 24 C.F.R. §203.500. A lender is required by the subpart

mentioned to:

 • Take those appropriate actions which can reasonably be expected to generate the smallest

financial loss to the Department… include[ing], but are not limited

to…partial claims under § 203.414, assumptions under § 203.512, special

forbearance under §§ 203.471 and 203.614, and recasting of mortgages under §

203.616; See 24 C.F.R. § 203.501₄

 • Make reasonable efforts to arrange or hold a **face-to-face interview** with the

homeowner **before** three monthly installments on the mortgage are unpaid; 24

C.F.R. §203.604.₅

 For all loans in default for *three* months, document that the lender has considered

**all** loss mitigation options to determine which, if any, are appropriate before

initiating foreclosure; 24 C.F.R. §203.605.

89. Defendant BAC failed to undertake these required loss mitigation efforts therefore, BAC has not met a condition precedent to foreclosure of this loan, namely the requirement of such.

90. The breach caused Plaintiffs' injuries.

## Count Three: Unreasonable Collection Efforts

91. The allegations of paragraphs 13 –73 above are re-alleged and incorporated by reference herein.

92. Defendant BAC's efforts to collect on Plaintiffs' loans were unreasonable. Defendant BAC engaged in a course of harassment and misinformation that was intentional, knowing and reckless. In order to recover exemplary damages for a creditor's unreasonable collection efforts, the debtor must prove malice or reckless disregard for the rights of others. Here, Defendant BAC ("Bank of America") repeatedly refused to recognize payments that the Plaintiffs made on their account. Defendant BAC continued to charge the Plaintiffs as if such payments had not been made and continued to insist upon payment for such amounts.

93. Plaintiffs request actual damages including mental anguish, and exemplary damages.

4 Wells Fargo Home Mortg., Inc. v. Neal, 398 Md. 705 (Md. 2007) (holding that "under principles of equity, a mortgagee's commencement of a foreclosure proceeding on an FHA-insured mortgage, without first having adhered to the mandatory HUD loss mitigation regulations, may invalidate the mortgagee's declaration of default.")
5 See Wash. Mut. Bank v. Mahaffey, 154 Ohio App. 3d 44 (Ohio Ct. App., Montgomery County 2003) (finding that a "common-sense construction of the regulation is that it requires…that a lender either have a face-to-face interview,or make a reasonable effort to arrange the interview, before bringing a foreclosure action.")

## Count Four: Intentional Misrepresentation

94.  The allegations of paragraphs 13 –73 above are re-alleged and incorporated by reference herein

95.  Defendant BAC made representations to Plaintiffs, in the course of its business and in a transaction in which it had a pecuniary interest. These representations were intentional or, in the alternative, negligent. *In law, **Malicious Intent** refers to the intent, without just cause or reason, to commit a wrongful act that will result in harm to another. It is the intent to harm or do some evil purpose.*

96.  Defendant supplied false information to Plaintiffs.

97.  Defendant did not exercise reasonable care or competence in obtaining or communicating the information.

98.  Plaintiffs justifiably relied on the information, expecting that Defendant BAC would engage in a meaningful review of their request for assistance or other information.

99.  Defendant's misrepresentations proximately caused Plaintiffs' injuries.

100.  *Intentional Misconduct* -- the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the

claimant would result and, despite that knowledge, *intentionally* pursued that course of conduct, resulting in injury or damage. §768.72(2)(a), *Fla. Stat.* (1999 damages).

Defendant BAC deliberately and intentionally injured the Plaintiffs by accepting payments from them but then failing to apply the payments to their account. Plaintiff (IsabelSantamaria), expressed to the Defendant BAC several times to correct these issues because she was being emotionally harmed and that it was also affecting her health. Defendant BAC's representations were false, fraudulent and inaccurate and which were made recklessly and with total disregard for the truth or validity thereof. Defendant repeatedly misrepresented and misstated the amounts owed.

### Count Five: Fair Debt Collections Practices Act ("FDCPA")

101. The allegations of paragraphs 13 –73 above are re-alleged and incorporated by reference herein.

102. Under the Fair Debt Collection Practices Act, any person or *entity*, including lawyers, who regularly attempts to collect consumer debts is considered a debt collector and is therefore required to respond to proper debt validation requests. In contrast, the original creditor and its employees are generally not subject to the FDCPA, though they may be regulated by other state and federal laws; including the Fair Credit Reporting Act, which was modified by the Fair and Accurate Credit Transactions Act *in 2003.* The **Fair Debt Collection Practices Act (FDCPA),** 15 U.S.C. § 1692 et seq., is a United States statute added in 1978 as Title VIII of the Consumer Credit Protection Act. Its purposes are to eliminate abusive practices in the collection of

consumer debts, to promote fair debt collection, and to provide consumers with an avenue for

disputing and obtaining validation of debt information in order to ensure the information's

accuracy. The Act creates guidelines under which debt collectors may conduct business, defines

rights of consumers involved with debt collectors, and prescribes penalties and remedies for

violations of the Act. It is sometimes used in conjunction with the Fair Credit Reporting Act. The

original Act excluded lawyers from the Act's coverage, but this was changed in 1986.

103. Defendant BAC was seeking unjustified and *erroneous* amounts, which would include

demanding any amounts not permitted under an applicable contract or as provided under

applicable law. Bank of America refused to correct these amounts and continued to harass the

Plaintiffs for an extended period of time even though the amounts being collected were incorrect.

104. Because the conduct of Defendants was frequent and persistent, because the nature of

the violations of the FDCPA were so egregious, because the FDCPA violation were part of a

deliberate scheme, Plaintiffs are entitled to the maximum possible relief permitted under 15

U.S.C. § 1692k(a)

105.  Plaintiffs were injured as a result of Defendant's wrongful acts.

106.  Plaintiffs request actual, statutory, and exemplary damages.


## Count Six: Federal Trade Commission's Safeguards Rule


107.  The allegations of paragraphs 13 –73 above are re-alleged and incorporated by

reference herein.

108.   Defendant BAC ("Bank of America") **intentionally** loses financial documentation for

Loan Modifications. This is in clear violation of the *"Federal Trade Commission's Safeguards*

*Rule"* [67 Fed Reg 36484 (May 23, 2002)]  Financial institutions covered by this Rule include

companies that engage in a wide variety of "financial activities," such as brokering or **servicing**

**consumer loans**; transferring or safeguarding money; preparing individual tax returns; providing

financial advice or credit counseling; providing residential real estate settlement services;

collecting consumer debts; and an array of other activities that are deemed "financial" by pre-

existing regulations. A list of the financial activities that trigger the Rule can be found on the

FTC's Web site. The Safeguards Rule applies both to **financial institutions that collect**

**information from their customers** and to financial institutions - such as credit reporting

agencies, ATM operators, and check cashing services - that receive customer information from

other financial institutions. Standards for Insuring the Security, Confidentiality, Integrity and

**Protection** of Customer Records and Information, 16 C.F.R. Part 314.

109.   Defendant BAC's ("Bank of America") malicious and reckless negligence in regards to

Plaintiffs personal documents which included Social Security numbers for Plaintiff and their

children (Federal Tax Returns), Bank Account information, Signatures of Plaintiffs, Address,

Utility Account information and Income information (paystubs) caused Plaintiffs unnecessary

harm and anguish. Plaintiffs were injured by Defendants wrongful acts.

110. Plaintiffs request exemplary damages and any damages that the court see as just.


## Count Seven: Violations of Rackateer Influenced and Corrupt Organizations Act (RICO), 19 U.S.C. § 1961, *et seg.*


111.  The allegations of paragraphs 13 –73 above are re-alleged and incorporated by reference herein


112.  Defendant BAC ("Bank of America") has shown a consistent pattern of "criminal organization". RICO was enacted by section 901(a) of the Organized Crime Control Act of 1970 (Pub.L. 91-452, 84 Stat. 922, enacted October 15, 1970). RICO is codified as Chapter 96 of Title 18 of the United States Code, 18 U.S.C. § 1961–1968. While its intended use was to prosecute the Mafia as well as others who were actively engaged in organized crime, its application has been more widespread. RICO also permits a *private individual* harmed by the actions of such an enterprise to file a civil suit; if successful, the individual can collect treble damages. A civil RICO action, like many lawsuits based on federal law, can be filed in state or federal court.


113.  The U.S. Supreme Court has instructed **federal** courts to follow the continuity-plus-relationship test in order to determine whether the facts of a specific case give rise to an **established pattern**. Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (*H.J. Inc. v. Northwestern Bell Telephone Co.*) Continuity is both a closed and open ended concept, referring to either a closed

period of conduct, or to past conduct that by its nature projects into the future with a threat of *repetition.*

114. Defendant BAC ("Bank of America") is currently dealing with lawsuits that contend its foreclosure machinery amounted to a racketeering enterprise. One such case, an Indiana lawsuit against Bank of America filed in October 2010, was filed under civil Racketeering Influenced and Corrupt Organizations or RICO laws, which allows damages to be tripled. The case is Davis v. Countrywide Home Loans Inc., 10-cv-01303, U.S. District Court, Southern District of Indiana (Indianapolis). Bank of America is also currently being sued by the states of Arizona and Nevada for its *fraudulent activities* against homeowners requesting loan modifications. There are additional charges also filed in both cases. The Arizona case is *Arizona v Bank of America, CV2010- 33580, Maricopa County Superior Court (Phoenix).* The Nevada case is *Nevada v. Bank of America, Eighth Judicial District Court, Clark County (Las Vegas).*

115. There is a systematic pattern of deception, fraud and terror by Bank of America (BAC) against its customers. There are thousands of complaints filed against Bank of America that are consistent with accusations against a "criminal organization". These complaints are filed with the Attorney Generals, Congressmen and Senators in all fifty (50) states, Office of the Comptroller of the Currency (OCC), Federal Trade Commission (FTC) and Better Business Bureau (BBB), among others. There are countless of other complaints against Bank of America (BAC) that are also not coincidental which include but are not limited to: fraud, theft, lost paperwork for loan modifications, lies, breach of contracts and forged documents. These complaints and stories can be found on websites or blogs such as: www.consumeraffairs.com, www.complaintsboard.com,

www.my3cents.com, www.measuredup.com, www.ripoffreport.com,

www.americanbadbusinesslist.com, www.bank-of-america.pissedcustomer.com,

www.piggybankblog.com, www.huffingtonpost.com, www.nowpublic.com, www.youtube.com

and many others.

116. Plaintiffs have previously expressed to their Attorney General, Congressman and the

Office of the Comptroller of the Currency that they truly believe that Defendant BAC is a

"Criminal Organization" and should be held accountable as such. A file was previously opened

by the Attorney General's Economic Crimes Division in regards to the complaints filed by the

Plaintiffs against the Defendant BAC.

117. **Embezzlement** may range from the very minor in nature, involving only small

amounts, to the immense, involving large sums and sophisticated schemes. More often than not,

embezzlement is performed in a manner that is premeditated, systematic and/or methodical, with

the explicit *intent* to conceal the activities from other individuals, usually because it is being

done without their knowledge or *consent*.

118. **Fraud** is defined to be "an intentional perversion of truth" or a "false misrepresentation

of a matter of fact" which induces another person to "part with some valuable thing belonging to

him or to surrender a legal right".

119. **Theft** *actus reus* is usually defined as an unauthorized taking, keeping or using of

another's property which must be accompanied by a *mens rea* of dishonesty and/or *intent* to

permanently deprive the owner or the person with rightful possession of that property or it's use.

120. **Obstruction of Justice** in United States Jurisdiction refers to the crime of interfering with the work of police, investigators, *regulatory agencies*, prosecutors or other (usually government) *officials*. Providing *false* information to officials is an obstruction of justice. Defendant BAC was being investigated by Office of the Comptroller of the Currency (OCC) who initiated this investigation requested by Congressman Bill Posey regarding the Plaintiff's allegations of malicious and reckless fraud among other claims. The OCC was conducting an investigation and is a regulatory agency with authority. The Federal Housing Administration (FHA) is a regulatory agency. The Attorney General of Florida and the Congressman of Florida are "government officials". Defendant BAC ("Bank of America") intentionally delayed the investigation and provided false information to the OCC, FHA, the Florida Attorney General and Congressman of Florida regarding the Plaintiff's allegations and/or their account.

121. Plaintiffs have experienced *at least* two (2) of the thirty-five (35) "RICO" crimes which is a requirement to initiate this charge. Those found guilty of racketeering can be fined up to $25,000 and sentenced to 20 years in prison per racketeering count. In addition, these crimes by Defendant BAC are *not* isolated incidents but are in fact a way of business for them. This is the way they continue to operate and will continue to do so until they are stopped. BAC is a fraudulent business and should be held accountable as such. Defendant BAC, are considered by their customers as "bullies" that cannot be confronted. Customers often feel "intimidated" by Defendant BAC and its "too big to fail" demeanor. Defendant BAC ("Bank of America"), have demonstrated arrogance for many years believing that they are a superior power that cannot be defeated. These characteristics are typical in "criminal organizations".

122. Plaintiffs were injured as a result of Defendant's wrongful acts.

123. Plaintiffs request actual, statutory, and exemplary damages.


## VII. REQUEST FOR RELIEF

A home is uniquely valuable. It is the largest investment many Floridians will make in their lifetimes, and provides one of the few opportunities to build wealth. But a home is also where the Plaintiffs raise their children and accumulate their memories. Misrepresentations that jeopardize a borrower's home are unconscionable and the damage is irreparable. Defendant BAC's misrepresentations to borrowers are systemic in nature and widespread in practice. Plaintiffs therefore ask that this court:

(1) Enter a temporary and permanent injunction that Defendant BAC, including its agents, employees and contractors, refrain from practices, policies, and plans that result in or increase Defendants' misrepresentations, errors, falsehoods, barriers to timely, accurate communication with Plaintiffs which are identified by the Court through the course of this litigation;

(2) Award Plaintiffs their actual, statutory, and exemplary damages;

(3) Plaintiffs would like to completely eliminate all ties with Defendant BAC ("Bank of America").

(4) Award Plaintiffs their costs, filing and court fees; and

(5) Grant such other relief as Court finds necessary and just.

Respectfully Submitted,

_____

Abdiel Echeverria – Plaintiff (Pro Per)

_____

Isabel Santamaria – Plaintiff (Pro Per)

499 Cellini Ave NE

Palm Bay, Florida  32907

Tel: (321) 676-4198 or (321)750-6697

andyecorso@yahoo.com,

Isabel-1229@hotmail.com or

Isabel_1170@yahoo.com.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

CASE NO.   <u>6:10-CV-1933-ORL-31-GJK</u>

## <u>CERTIFICATE OF SERVICE</u>

I, do hereby CERTIFY that a true and correct copy of the <u>First Amended Complaint</u> has

been furnished to: <u>Jessica L. Gavrich, Attorney for Defendant BAC Home Loans Servicing, LP,</u>

<u>and Bank of America N.A.</u> by ( **X** ) mail ( ) fax ( ) mail and fax ( **X** ) email

( ) hand-delivery on this <u>31st</u> day of <u>January</u>, 20 <u>11.</u>

_____
Abdiel Echeverria – Plaintiff

_____
Isabel Santamaria – Plaintiff

499 Cellini Ave NE
Palm Bay, FL 32907
(321) 676-4198 or (321) 750-6697